# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| CATHY ELLEN FLATT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 2:16-cv-00018 |
| v. | ) | Judge Sharp / Frensley |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the

final decision of the Commissioner of Social Security denying Plaintiff Disability Insurance

Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is

currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No.

12. Plaintiff has filed an accompanying Memorandum. Docket No. 13. Defendant has filed a

Response, arguing that the decision of the Commissioner was supported by substantial evidence

and should be affirmed. Docket No. 14.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for

Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner

be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed her application for Disability Insurance Benefits ("DIB") on June 7, 2012,

alleging that she had been disabled since October 10, 2006, due to fibromyalgia, migraines, hypertension, depression, TMJ, anxiety, gerd, sleep apnea, and vertigo. *See, e.g.,* Docket No. 6, Attachment ("TR"), pp. 188-90, 223. Plaintiff's application was denied both initially (TR 124) and upon reconsideration (TR 143). Plaintiff subsequently requested (TR 157) and received (TR 158-84) a hearing. Plaintiff's hearing was conducted on June 10, 2014, by Administrative Law Judge ("ALJ") James Dixon. TR 73-105. Plaintiff and vocational expert ("VE"), James D. Flynn, appeared and testified. *Id.*

On August 25, 2014, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 22-45. Specifically, the ALJ made the following findings of fact:

> 1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2013.
>
> 2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of October 10, 2006 through her date of last insured of September 30, 2013 (20 CFR 404.1571 *et seq.*).
>
> 3. Through the date last insured, the claimant had the following severe impairments: an affective mood disorder and an anxiety-related disorder (20 CFR 404.1520(c)).
>
> 4. Through the date last insured, the claimant did not have an impairment of combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels and can remember and carry out simple, one to two step instructions. She can maintain a work routine without

frequent breaks for stress-related reasons.  She can maintain an ordinary work routine without inordinate supervision.  She can maintain socially appropriate behavior, hygiene, and grooming.

6.  The claimant has no past relevant work (20 CFR 404.1565).

7.  The claimant was born on June 20, 1958, and was 55 years old, which is defined as an individual of advanced age, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from October 10, 2006, the alleged onset date, through September 30, 2013, the date last insured (20 CFR 404.1520(g)).

TR 27-40.

On October 2, 2014, Plaintiff timely filed a request for review of the hearing decision.

TR 21.  On January 13, 2016, the Appeals Council issued a letter declining to review the case

(TR 1-6), thereby rendering the decision of the ALJ the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. § 405(g).

If the Commissioner's findings are supported by substantial evidence, based upon the record as a

whole, then these findings are conclusive.  *Id.*

## II.  REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of record.  Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III.  CONCLUSIONS OF LAW

### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine: (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion."  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Comm'r of Soc. Sec.,* 105 F.3d 244, 245 (6th Cir. 1996), *citing Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion

reached. *Her*, 203 F.3d at 389, *citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985), *citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnoses and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process summarized as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

5

(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments or its equivalent.[1]  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a prima facie case of disability.

(5) The burden then shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*See, e.g.* 20 CFR §§ 404.1520, 416.920.  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  *Moon*, 923 F.2d at 1181; 20 CFR § 404, Subpt. P, App. 2, Rule 200.00(e)(1), (2).  *See also Damron v. Sec'y of Health & Human Servs.*, 778 F.2d 279, 281-82 (6th Cir. 1985).  Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In

---

[1] The Listing of Impairments is found at 20 CFR § 404, Subpt. P, App. 1.

such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments: mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erroneously: (1) found her fibromyalgia to be a non-severe impairment; (2) evaluated Dr. Gotcher's opinion; (3) evaluated her mental health restrictions; and (4) rejected her credibility. Docket No. 13. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is

overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

## 1. Fibromyalgia as Non-Severe Impairment

Plaintiff argues that "[d]espite the rheumatologist and [Plaintiff's] long time treating doctor finding that [Plaintiff] has fibromyalgia, the ALJ imposed no work-related the [*sic*] functional limitations as a result of this severe impairment in assessing plaintiff's RFC." Docket No. 13, p. 15. Plaintiff asserts that "it is undisputed that she suffers from fibromyalgia," as two of her treating physicians have diagnosed the condition, including performing the trigger point test. *Id.* Plaintiff further asserts that because the ALJ rejected the opinions of these two treating physicians in favor of a non-examining medical expert, the ALJ's decision regarding fibromyalgia is not supported by substantial evidence. *Id.*

Defendant responds that the ALJ properly found Plaintiff's fibromyalgia to be a medically determinable impairment based on record evidence of trigger point testing; however, such a finding does not automatically imply that Plaintiff is disabled or entitled to benefits. Docket No. 8, 4-5. Rather, Defendant argues, after considering the record as a whole, the ALJ "properly found the impairment did not impose more than mild work-related limitations (Tr. 32-33)." *Id.* at 5. Defendant contends that the ALJ properly found that Plaintiff's allegations regarding her impairment due to fibromyalgia were "inconsistent with the record as a whole, including the

medical opinions, her medical treatment, and the medical evidence (Tr. 28-39)." *Id.*

Both the Social Security Regulations and the Sixth Circuit have addressed the manner in which fibromyalgia should be considered by an ALJ. *See, e.g.*, SSR 12-2p, 2012 LEXIS 1; *Luukkonen v. Comm'r of Soc. Sec.*, 2016 U.S. App. LEXIS 11644 (6th Cir. 2016). Fibromyalgia is diagnosed by (1) testing focal points for tenderness and (2) ruling out other possible conditions through objective medical and clinical trials. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007). Once fibromyalgia has been diagnosed, SSR 12-2p states that "[a]s with any adult claim for disability benefits, we use a 5-step sequential evaluation process to determine whether an adult with a[n] [medically determinable impairment] of [fibromyalgia] is disabled." 2012 SSR LEXIS 1 at *15. Explaining how the evaluation process should then proceed, in the context of a claimant with a diagnosis of fibromyalgia, SSR 12-2p states:

> A. At step 1, we consider the person's work activity. If a person with FM[2] is doing substantial gainful activity, we find that he or she is not disabled.
>
> B. At step 2, we consider whether the person has a "severe" [medically determinable impairment](s). If we find that the person has an [*sic*] [medically determinable impairment] that could reasonably be expected to produce the pain or other symptoms the person alleges, we will consider those symptom(s) in deciding whether the person's impairment(s) is severe. If the person's pain or other symptoms cause a limitation or restriction that has more than a minimal effect on the ability to perform basic work activities, we will find that the person has a severe impairment(s).
>
> C. At step 3, we consider whether the person's impairment(s) meets or medically equals the criteria of any of the listings in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (appendix 1). FM cannot meet a listing in appendix 1 because FM is not a listed impairment. At step 3, therefore, we determine

---

[2]SSR 12-2p uses the abbreviation "FM" for fibromyalgia. *See* 2012 SSR LEXIS 1 at *1.

whether FM equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment.

D.  Residual Functional Capacity (RFC) assessment: In our regulations and SSR 96-8p, we explain that we assess a person's RFC when the person's impairment(s) does not meet or equal a listed impairment.  We base our RFC assessment on all relevant evidence in the case record.  We consider the effects of all of the person's medically determinable impairments, including impairments that are "not severe."  For a person with FM, we will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have "bad days and good days."

*Id.* at *16-17 (footnote added).

The ALJ in the instant case discussed Plaintiff's assertions of fibromyalgia as follows:

While the claimant has medically determinable fibromyalgia confirmed by tender trigger points, fibromyalgia has responded favorably to medication and other conservative treatments such as physical therapy and mental health intervention with no evidence to suggest that fibromyalgia results in more than mild work-related limitations.  The undersigned finds that the claimant's allegations of disabling pain and functional limitations from October 10, 2006, through September 30, 2013, the date last insured, are not fully supported by the medical evidence of record.  Evidence shows fibromyalgia exacerbations from time to time, but nothing of the frequency and/or severity to preclude all work or result in more than mild limitations in work activity.  With the exception of positive tender points, her physical and neurological examinations have been normal including a normal consultative examination in August 2012.  There is no objective medical basis for finding the claimant had debilitating fibromyalgia prior to her date last insured or that fibromyalgia resulted in more than mild limitations in work activity.  More recently evidence shows minimal use of prescription pain medication, and she has only rated her pain a two to four on a scale of one to ten, ten being the most severe pain, which is not consistent with her alleged degree of pain.  The undersigned also reiterates that despite alleging disability as of October 10, 2006, she sought minimal treatment for her

fibromyalgia complaints until 2008 and per her testimony, she only sees Dr. Steigelfest, her rheumatologist, on a yearly basis. The claimant testified that fibromyalgia causes constant pain and there are only one or two days a month that she does not have significant pain. However, treating notes only reflect mild levels of pain per her report. She testified that she takes hydrocodone for pain, but treating notes reflect no significant use of prescription pain medication and she is able to go several days without any pain medication. She testified that three to four days a week she only requires one pain pill a day, which she considers a good day. She stated that her pain medication causes "some" drowsiness for about four hours. On a good day, she does some household chores and takes her dog for a walk. She testified that she has muscle spasms, but clinical examinations only reflect tenderness. She testified that on a bad day she spends the day in bed under an electric blanket because her body is sore to touch. She testified that there are many days that she wakes up in pain, takes one or two pain pills, and stays in bed due to fibromyalgia and migraines. However, evidence fails to show this is medically necessary, as she has repeatedly been encouraged to increase her activities including aerobic exercise. While she likely has good and bad days, evidence fails to show that bad days are of the frequency and/or severity to result in more than mild limitations in work activity. She testified that nine out of ten times she has to cancel plans due to pain, fatigue or sadness, but treating notes indicate she remains active and engaged in a wide variety of daily activities including the ability to drive/travel long distances on vacation.

She testified that Dr. Simmons, her dentist, told her not to lift more than 10 pounds, but this is not supported by any evidence of record from Dr. Simmons. She testified that she has trouble sitting, standing and walking due to hip, back, and leg pain, but evidence fails to support a medically determinable impairment of the hips, back, or legs, and fibromyalgia pain is under good control with medication. There is nothing in the record indicating it is medically necessary for the claimant to take a nap during an eight-hour period of time when in fact she has been encouraged to increase her activity. She indicated that napping during the day became a habit during cancer treatment. The undersigned notes that the claimant entered and exited the hearing room, and sat throughout the hearing without any signs of discomfort or difficulties. Overall, there exists little objective evidence in the record to substantiate the claimant's alleged disabling fibromyalgia

limitations.  The undersigned finds fibromyalgia is a non-severe impairment resulting in no more than mild limitations in work-related activities for 12 continuous months.

TR 32-33.

As can be seen, the ALJ acknowledged that Plaintiff's doctors have diagnosed her with fibromyalgia, and discussed both the medical evidence and Plaintiff's testimony and subjective claims related to fibromyalgia.  *Id.*  In assessing the degree of limitation resulting from Plaintiff's fibromyalgia, however, the ALJ found that the evidence supported only mild limitations, and supported his finding with reference to the evidence of record.  *Id.*  The ALJ's detailed rationale demonstrates that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on evidence that was inconsistent with Plaintiff's allegations.  This is within the ALJ's province.

At step two of the sequential evaluation process, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe."  20 CFR § 404.1520(c). An impairment or combination of impairments is "severe" within the meaning of the Regulations if it significantly limits a claimant's physical or mental ability to perform basic work activities; conversely, an impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities.  *Id.*; 20 CFR §§ 404.1521(a), 416.920(c), 416.921(a).  The Sixth Circuit has described the severity determination as a de minimis hurdle in the disability determination process, the goal of which is to screen out groundless claims.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). Where the ALJ finds that the claimant has at least one severe impairment and proceeds to

complete the sequential evaluation process, however, the ALJ's failure to find that another condition is a severe impairment cannot constitute reversible error. *See Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

The ALJ in the case at bar found that Plaintiff had the following severe impairments: an affective mood disorder and an anxiety-related disorder. TR 27. After explicitly finding at step two that Plaintiff had an impairment or combination of impairments that was severe, the ALJ continued his evaluation of the evidence and completed the sequential evaluation process. *See* TR 27-40. Because the ALJ specifically found that Plaintiff had at least one severe impairment and completed the sequential evaluation process, the ALJ's failure to find Plaintiff's fibromyalgia to also be severe simply cannot constitute reversible error. *See Maziarz*, 837 F.2d at 244 (6th Cir. 1987). Additionally, the ALJ considered Plaintiff's fibromyalgia symptoms and all relevant evidence in the case record, including Plaintiff's account of having both good days and bad days, as required by SSR 12-2p, quoted above. Accordingly, Plaintiff's argument on this point fails.

## 2. Dr. Gotcher's Opinion

Plaintiff maintains that the ALJ erred in his assessment of the opinion of Plaintiff's treating physician, Jane Gotcher, M.D. Docket No. 13, p. 15-16. Plaintiff points to her long-standing treatment relationship with Dr. Gotcher and contends that Dr. Gotcher's opinion is supported by objective evidence. *Id.* at 16. Plaintiff also asserts that Dr. Gotcher, in addition to frequently treating Plaintiff and prescribing her medications, has referred Plaintiff to specialists, including rheumatologist Eli Steigelfest, M.D., who confirmed Dr. Gotcher's diagnosis of fibromyalgia by performing trigger point testing. *Id.*

13

Defendant responds that the ALJ properly considered the medical opinions in the record, including that of Dr. Gotcher. Docket No. 14, p. 6-9. Defendant argues that the ALJ properly found that Dr. Gotcher's opinion was inconsistent with the record as a whole. *Id.* at 8. Specifically, Defendant argues that Dr. Gotcher's assessments of Plaintiff with neuropathy, weakness, and speech problems were not confirmed by Plaintiff's other physicians or examiners (including Dr. Steigelfest). *Id.* Defendant also argues that:

> At this point it is important to note that Plaintiff's application for disability benefits was a condition of her divorce requested by her husband (Tr. 29-31, 36, 83, 243, 357, 732). Plaintiff's husband is a doctor in the same office as Dr. Gotcher (Tr. 342).

*Id.* at 7, n.2.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in

paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. . . .

(3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion . . . .

(4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

. . .

20 CFR § 416.927(c) (emphasis added).  *See also* 20 CFR § 404.1527(c).

The ALJ must articulate the reasons underlying his decision to give a medical opinion a specific amount of weight.[3]  *See, e.g.,* 20 CFR § 404.1527(d); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646 (6th Cir. 2009); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  The reasons must be supported by the evidence and must be sufficiently specific so as to make clear to any subsequent reviewers the weight the ALJ gave to the treating source medical opinion and the reasons for that weight.  SSR 96-2p.

The Sixth Circuit has held that, "[p]rovided that they are based on sufficient medical data, the medical opinions and diagnoses of treating physicians are generally accorded substantial

---

[3] There are circumstances when an ALJ's failure to articulate good reasons for the weight accorded to medical opinions may constitute harmless error: (1) if a treating source opinion is so patently deficient that the ALJ could not possibly credit it; (2) if the ALJ adopts the opinion or makes findings consistent with the opinion; and/or (3) if the ALJ has complied with the goal of 20 CFR § 1527(d), by analyzing the physician's contradictory opinions or by analyzing other opinions of record.  *See, e.g., Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010); *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-72 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir. 2006).

deference, and if the opinions are uncontradicted, complete deference." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002), *quoting Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). If the ALJ rejects the opinion of a treating source, however, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 CFR § 404.1502.

The ALJ in the instant action discussed the medical opinion evidence as follows:

> Dr. Gotcher completed a questionnaire on July 12, 2012, indicating she treats the claimant for fibromyalgia, TMJ, a history of breast cancer, hypertension, and depression. Medications included Effexor, Lorazepam, Seroquel, amlodipine, and Zolpidem, which were actually prescribed by Dr. Roberson. She noted that the claimant is in significant pain and is easily fatigued. She assessed a moderate impairment in memory, concentration, and social functioning. In her opinion, the claimant cannot do simple, one to two step tasks or maintain a work routine, as she requires breaks with simple housework. She noted that the claimant has trouble staying on task and is easily overwhelmed by stress, but she can maintain socially appropriate behavior, hygiene, and grooming. Per Dr. Gotcher, the claimant can care for herself and maintain independence in daily living tasks on a sustained basis. She did not feel the claimant could work a schedule without missing frequently due to psychological and physical issues. (Exhibit 11F).
>
> . . .
>
> Dr. Gotcher completed a medical source statement of ability to do work-related activities (physical) on May 13, 2013, and in her opinion the claimant cannot perform even sedentary work on a sustained basis. However, she noted that limitations were related to issues with neuropathy, but there is no evidence of record of

medically determinable neuropathy. She also noted that the claimant has problems with choice of words and fluency of speech, which is not supported by the evidence of record. Likewise, the treating notes of Dr. Gotcher do not support severe and disabling levels of fatigue and exhaustion as noted in the medical source statement. She was able to make another trip to Florida in July after which she reported increased pain and Amitriptyline was increased. The claimant's date last insured expired September 20, 2013. (Exhibit 24F and 25F)

. . .

As for the opinion evidence, State agency program physicians determined initially and upon reconsideration that the claimant does not have physical impairment that results in more than mild limitations in work-related activities. A consultative examiner opined that the claimant could be expected to sit six to eight hours in an eight-hour workday and stand and/or walk six hours in an eight-hour workday during which time she could perform lifting and carrying without restriction as tolerated. The undersigned accepts the opinions of the State agency program physicians and finds the claimant does not have a severe physical impairment. The undersigned notes that Social Security Regulation 20 CFR 404.1527 provides that "state agency physicians are highly qualified physicians who are also experts in Social Security disability evaluation." The undersigned finds the opinions of the State Agency examining and non-examining physicians are credible assessments of the claimant's physical impairments and gives the opinions great weight. (Exhibit 1A, 3A and 15F)

The undersigned carefully considered the opinions of Dr. Gotcher, the claimant's long-time treating physician, which preclude the claimant from all work due to a combination of fibromyalgia, TMJ, history of breast cancer, migraines, and depression. However, as noted in the treating record, Dr. Gotcher felt the claimant should pursue disability to get insurance given her history of breast cancer. Furthermore, the limitations as set forth by Dr. Gotcher are not fully supported by the objective evidence in this case and it is therefore reasonable to conclude that Dr. Gotcher assessed greater limitations given her support of the claimant's need for insurance due to her pending divorce. In addition, the claimant has not alleged severe and disabling levels of fatigue as noted by Dr. Gotcher, was only taking one pain pill a day at the time of Dr.

Gotcher's opinions, was engaged in a number of activities including volunteer work, was independent in daily living tasks on a sustained basis, and was improving emotionally with sustained mental health treatment with normal mental status evaluations per Dr. Roberson.  For these reasons, Dr. Gotcher's opinions, both physical and mental, are found to be neither controlling nor persuasive, and are given little weight (20 CFR 404.1527(d) and SSR 96-2p).  (Exhibit 11F and 24F)

TR 30, 31, 37-38.

Dr. Gotcher treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's according greater weight to her opinion than to other opinions, as long as that opinion was supported by medically acceptable clinical and laboratory diagnostic techniques, and consistent with the evidence of record.  As can be seen, however, Dr. Gotcher's opinion contradicts other substantial evidence in the record.  As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record.  *See* 20 CFR § 416.927(d)(2); 20 CFR § 404.1527(d)(2).  Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above.  *Id.*  When the opinions are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner.  20 CFR § 416.927(e)(2).

Because Dr. Gotcher's opinion was inconsistent with other substantial evidence in the record, the Regulations do not mandate that the ALJ accord Dr. Gotcher's evaluation controlling weight.  Accordingly, Plaintiff's argument fails.

### 3.  Plaintiff's Mental Health Restrictions

Plaintiff contends that the ALJ erred in his evaluation of her mental health impairments, specifically, her depression and anxiety.  Docket No. 13, p. 16-17.  Plaintiff argues that the record documents her history of suffering from these impairments, including a hospital admission for severe depression and mental health treatment by Dr. Cliff Roberson, Mike Palk, and Jerrell Killian.  *Id.*  Plaintiff points to her assessment with a GAF of 25 upon her hospital admission and 50 upon discharge.  *Id.*  Plaintiff asserts that Mr. Killian, a consultative psychologist, "found Plaintiff to have major depression with a moderate impairment in her ability to adapt."  *Id.* at 17.  Plaintiff further asserts that her mental health condition "severely impacts [Plaintiff's] ability to function on a consistent basis."  *Id.*

Defendant responds that the ALJ "properly considered the record as a whole and found that her affective mood disorder and anxiety-related disorder were severe impairments (Tr. 27)."  Docket No. 14, p. 10.  Defendant argues that in finding that these impairments limit Plaintiff to simple work, the ALJ properly weighed the medical opinion evidence and resolved conflicts among the various opinions.  *Id.* at 10-12. Defendant further argues that the ALJ properly considered Plaintiff's medical treatment for mental impairments, including Plaintiff's hospitalization, her subjective allegations, and inconsistencies within the record related to Plaintiff's mental impairments.  *Id.* at 12-14.  Defendant concludes that the ALJ's finding that Plaintiff can perform a range of simple work is supported by substantial evidence.  *Id.* at 14.

The ALJ discussed the evidence related to Plaintiff's mental health impairments

as follows:

> In August 2009, a psychosocial evaluation by [Plaintiff's] dentist, Dr. Simmons, revealed problems with tension, worry, anxiety, sadness, depression, frustration, and both chronic and recent stress for which she was prescribed psychotropic medication by Dr. Gotcher.
>
> . . .
>
> Per Dr. Gotcher, situational depression and anxiety were fairly stable. However, depression and anxiety increased in April at which time she was prescribed Abilify. Inpatient treatment was considered as she had been crying nonstop for weeks and was spending most of her time in bed. She denied suicidal thoughts, but admitted feeling somewhat hopeless. (Exhibit 5F, 6F and 11F)
>
> The claimant was hospitalized from May 2, 2011, to May 5, 2011, for major depression, recurrent, severe. This was her first inpatient treatment for psychiatric reasons. Her symptoms began in January 2011 when her husband of 25 years filed for divorce and have progressively worsened. Additional stressors involved caring for her elderly parents and issues with her two children, one with Tourette's syndrome and the other who recently dropped out of college. She had taken antidepressants for 20 years, but denied any formal mental health treatment with the exception of six weeks of Christian counseling in February 2011. She denied suicidal attempts, mania, and agoraphobia, but reported some panic attacks. Discharge medications included amitriptyline, Effexor XR, Abilify, Ambien, and Ativan. She began seeing Clifford Roberson, M.D., a psychiatrist, in May 2011 for medication management. She saw Donna Southworth, LCSW, from May 2011 to November 2011 for counseling and supportive treatment. Per Dr. Gotcher, medication was beneficial. The claimant was going out daily and was trying to be around other people. She was also helping with vacation Bible school. She was prescribed Lorazepam for anxiety, which was beneficial allowing her to make a trip to Orlando with her children, another trip to Florida with a friend, and a trip to Gatlinburg with family. It was noted in December that her fibromyalgia was much better and she was taking another trip. Dr. Gotcher noted in January that Seroquel was helping significantly and the claimant reported that her moods were better than they had been in over a year. She denied having any significant emotional problems in

February 2012 and she was only needing to see her psychiatrist every three months. She was doing volunteer work, got a new dog, was getting out with friends, and was accepting her pending divorce. She continued to have some bouts of increased pain, which were primarily related to orthodontic adjustments. (Exhibits 3F, 4F, 7F and 11F)

In Dr. Gotcher's treating note dated March 22, 2012, it states the claimant was having increased emotional distress because her husband's lawyer requested she seek disability for which she had very conflicting feelings. Dr. Gotcher did not feel the claimant was capable of holding down a job because of fibromyalgia, headaches, and depression, but also noted that the claimant should pursue disability to get insurance particularly given her history of breast cancer. The claimant stated that she had never considered disability, as she had always been financially stable. She was only requiring one pain pill a day for fibromyalgia pain in May 2012. The claimant filed for disability benefits on June 1, 2012. (Exhibit 11F)

On June 30, 2012, Ms. Southworth completed a questionnaire indicating the claimant was coping better after counseling. Per Ms. Southworth, the claimant had adequate memory and social functioning, and a moderate impairment in concentration. In her opinion, the claimant could remember and carry out simple, one to two step instructions, maintain a work routine without frequent breaks for stress-related reasons, maintain an ordinary work routine without inordinate supervision, and maintain socially appropriate behavior, hygiene, and grooming. She noted that the claimant can care for herself and maintain independent daily living tasks on a sustained basis. She was unsure if the claimant could maintain a work schedule without missing frequently due to psychological issues. (Exhibit 10F)

. . .

On August 8, 2012, the claimant underwent a psychological consultative examination. She reportedly quit work in January 2001 due to physical problems, but spent a couple of days a month paying bills and taking care of other business activities for her estranged husband's medical practice. She reported that panic attacks now occur less than once a month with no panic attacks in the last six weeks. However, she reported ongoing bouts of

depression lasting up to three days with uncontrollable crying and isolating from others. She was tearful at times during the session, but was friendly, polite, and spontaneous with normal conversation and thoughts. There was no evidence of psychomotor abnormalities. She denied suicidal and homicidal thoughts. Measures of concentration, fund of information, and memory were normal. She was living with her 24-year-old son who has Tourette's. She does most of the cooking and takes care of all the laundry as well as executive activities such as paying bills and shopping. She uses a cell phone and e-mail. She does banking online. She drives and goes out with family and friends once or twice a month. She was also involved in church. She reported that counseling and medication were helpful, and only during inpatient treatment, was she unable to maintain executive functions. She was diagnosed with a major depressive disorder, recurrent, and a panic disorder with agoraphobia. The examiner concluded that memory, reasoning, and comprehension were more than adequate, and the claimant is able to get along well with others. The examiner opined that adaptability is moderately impaired by psychological problems and is her major issue. (Exhibit 14F)

. . .

The claimant returned to Dr. Roberson in July and August 2012, and was doing ok emotionally. She was less tearful, less depressed, and sleeping well. Medications included Effexor XR, Amitriptyline, Seroquel, and Zolpidem. Her mental status evaluations were unremarkable and within normal limits. Dr. Roberson noted in August that the claimant would be legally divorced when she gets disability. Per Dr. Gotcher's treating notes, her only stressor was her pending divorce. She was doing well in September 2012 and did not wish to change any of her medications. She had not required any pain medication in three days, but she had a fibromyalgia exacerbation in October. She was prescribed Duragesic and Skelaxin as she had another upcoming trip as well as an art show auction to attend in November. Per Dr. Roberson's treating notes, the claimant continued to do well in November and her mental status remained normal. (Exhibit 12F, 16F, 18F and 19F)

. . .

The claimant underwent ten counseling sessions from September

21, 2012, through October 3, 2013, with Mike Palk, LPC, for a major depressive disorder, recurrent, moderate. Mr. Palk noted in a letter dated October 9, 2013, that the claimant reported being diagnosed with fibromyalgia and per her report is often unable to be out and lead an active life in the community. She also reported to Mr. Palk that she stays home several days a month due to fibromyalgia pain, which affects her level of depression. She saw Mr. Palk again on October 10, 2013, and March 18, 2014. There are no treating notes of record from Mr. Palk, and other evidence indicates pain and depression are under relatively good control with medication. Treating notes from Dr. Gotcher reflect some increased headaches in October 2013 a few weeks after her braces were removed, which was expected and no changes were made in her medication regimen. Her mental status remained unremarkable and within normal limits in October 2013 and April 2014 per Dr. Roberson. Her divorce was still pending in April. (Exhibit 26F, 27F, 28F and 29F)

. . .

The undersigned finds that the claimant's allegations of disabling mental limitations since October 10, 2006, are not fully supported by the medical evidence of record, or of the severity to preclude all work. While the claimant has residual limitations precluding her from a full range of work activity and tasks, she remains capable of performing work within the identified residual functional capacity on a regular and sustained basis. Medical evidence fails to show that depression and anxiety are of the severity to preclude all work given her positive response to medication management and counseling. While she has generalized complaints of depression and anxiety, her complaints are treated symptomatically with prescription medication with no evidence to support a disabling mental impairment. The medical evidence shows her depression and anxiety respond to medication and do not persist at a level to preclude all work. While she has exacerbations from time to time, her exacerbations are not of the frequency and/or severity to preclude all work. Despite her continued allegations of disabling levels of depression and anxiety, her mental status evaluations have been unremarkable and within normal limits after appropriate mental health intervention. Mental status examinations do not suggest any marked or serious deficits in functioning. She was hospitalized on one occasion in May 2011, but only for three days. Overall, she is alert, focused, cooperative, and friendly, and

memory and concentration are intact to allow for simple tasks as set forth in the identified residual functional capacity assessment. She maintains a wide range of daily activities and executive functions including laundry, cooking, shopping, paying bills, and taking care of household chores and cleaning as needed. She also lives with and provides some care for her adult children. She maintains social interactions with friends and family, and takes several trips as noted in the treating record. The undersigned finds little objective evidence of record to substantiate the claimant's alleged mental limitations. For these reasons, the undersigned finds the claimant's allegations to be less than persuasive and not fully credible.

. . .

Per a field office disability report dated June 8, 2012, the claimant was polite, cooperative, well groomed, and well prepared, but did cry when discussing her divorce proceedings. Per her function report dated June 18, 2012, she did not have difficulty performing personal care. She was able to fix herself something to eat, do laundry, drive, shop in stores and by computer, pay bills, watch television, read books, play computer games, eat in restaurants, go to the movies, and interact with others on the phone, by computer, or by texting. Per her report, she can pay attention for an hour or two, follow directions, and get along with authority figures, but has difficulty handling stress and changes in routine, which has been allocated for in the identified residual functional capacity assessment. She also stated that she was applying for disability because of her impending divorce as she will be unable to qualify for insurance with her health history and will lose her insurance upon divorce. (Exhibit 3E and 5E)

The claimant testified on June 10, 2014, that her alleged onset date is the date she was diagnosed with breast cancer. She testified that she takes Effexor for her mental health problems and it causes dizziness and causes her blood pressure to go up. However, she has taken Effexor since 2008 with no evidence to suggest any severe and disabling side effects that would interfere with work activity. She lives with her two adult children. Her son has Tourette's and her daughter suffers with depression, but neither receive disability. She testified that she suffered with depression before her husband filed for divorce, but the divorce caused increased depression to the point she was not getting out of bed and

required brief inpatient treatment. She also began seeing a psychiatrist at this time. The claimant stated that her depression was "situational" and related to issues with her husband/divorce. Current medications include Effexor, amitriptyline, Seroquel, Zopidem [*sic*], and Relpax. Evidence shows she has been on these medications for a prolonged period of time indicating that she does get good results or changes would be made. Evidence reflects no severe or disabling side effects to these medications. She goes to bed around midnight and gets up around 10 a.m. unless her dog wakes her up. She testified that despite medication, she continues to have problems with depression, but mental status evaluations are unremarkable after appropriate intervention. She stated that seeing friends and family on Facebook on vacation at places the family used to go causes increased depression, and ultimately resulted in inpatient mental health treatment. She cries about once a week. She continues to see a counselor, which is helpful. She testified that she was having anxiety attacks three to four times a week when her husband left, and this went on for about six months, but medication has been helpful. She testified that she has only had one anxiety attack in the last three to four months that required her to take medication. They are usually triggered by her husband's activities she hears about. She testified that her children do the vacuuming and grocery shopping, but in August 2012 she was doing the cooking and laundry, and executive activities such as paying bills and shopping. She also took her parents to doctor appointments and went to church. The undersigned notes that while the claimant has some limitations, complaints of more extreme incapacity are not supported by the medical findings and statements reported to treating providers, and are inconsistent with regularly performed activities performed prior to her date last insured.

. . .

In regards to the claimant's mental impairments, a consultative examiner determined in August 2012 that the claimant has a major depressive disorder and a panic disorder, but she demonstrated more than adequate memory, reasoning, and comprehension, and gets along well with others per her report. The consultative examiner opined that adaptability was the claimant's major issue for which she is moderately impaired. The consultative examiner offered no specific, function-by-function work-related limitations. State agency program psychologists determined initially and upon

reconsideration that the claimant has a severe affective disorder and anxiety disorder with mild limitations in activities of daily living and social functioning, and moderate difficulties in maintaining concentration, persistence, or pace with no evidence of decompensation of extended duration.  She was found able to persist at simple and detailed tasks, maintain a consistent pace with reasonable rest periods, adapt to gradual infrequent changes, and set short-term goals with no social limitations.  A treating counselor, Donna Southworth, LCSW, opined on June 30, 2012, that the claimant could do simple tasks; work without inordinate supervision; maintain socially appropriate behavior, hygiene, and grooming; respond to normal stress and routine changes; take care of herself; and maintain independent [*sic*] in daily living tasks on a sustained basis.  She assessed a moderate impairment in concentration.  The undersigned finds the opinion of Ms. Southworth to be a credible and persuasive opinion, and gives her opinion great weight.  Although Ms. Southworth is not an acceptable medical source for the determination of disability, she had a treating relationship with the claimant and her opinion is well supported and reasonable given the record as a whole including the opinions of the State agency program psychologists.  Ms. Southworth questioned the claimant's ability to maintain a work schedule without missing frequently due to psychological issues, but treating notes show the claimant responded favorably to medication management with Dr. Roberson after Ms. Southworth's opinion with no evidence to suggest she was precluded from all work for 12 continuous months.  The claimant last saw Ms. Southworth on August 17, 2011; therefore, the benefits of medication as noted in the treating notes of Dr. Gotcher and Dr. Roberson were not adequately evaluated by Ms. Southworth, which warrants giving this portion of her opinion little weight. The opinions of the State agency program psychologists are given some weight, but greatest weight is given to the opinion of Ms. Southworth.  Overall, the claimant's mental impairments have been adversely affected by the claimant's divorce, but are situational and have responded favorably to mental health intervention with no evidence to suggest disabling mental limitations for a period of 12 continuous months.  (Exhibit 1A, 3A, 10F and 14F)

TR 29-31, 32, 35, 36-38.

As can be seen, the ALJ's decision addresses Plaintiff's mental health

impairments extensively and in detail, including her treatment history with her various providers, her medications, and her hospitalization, as well as her own testimony and activities of daily living, clearly indicating that all of these factors were considered. The ALJ's extensive explanation, which includes references to the evidence of record as well as the ALJ's reasoning, demonstrates that the ALJ appropriately considered and weighed the evidence and came to a well-reasoned and supported conclusion, and the Regulations do not require more.

Regarding Plaintiff's reference to GAF scores assigned to her upon admission to the hospital and upon discharge, GAF scores are not determinative of disability for Social Security purposes. In fact, the Social Security Administration has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements in [the] mental disorders listings." *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01 (August 21, 2000). Although "the GAF is a test used by mental health practitioners with respect to planning treatment and tracking the clinical progress of an individual in global terms, the ALJ is not bound to consider its results at the exclusion of other medically reliable evidence." *Presley v. Colvin*, 2014 U.S. Dist. LEXIS 180027 (M.D. Tenn. 2014) at 38, *citing Alvarez v. Barnhart*, 2002 U.S. Dist. LEXIS 21678, 2002 WL 31466411, at *8 (W.D. Tex. October 2, 2002). Nor is a GAF score determinative of an individual's RFC assessment. *Id.* at 38-39. ("A GAF score is not a rating typically relied upon with respect to assessing an individual's RFC under the Act."); *see also Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir.

2002) (GAF score is not essential in assessing RFC).

## 4.  Credibility

Plaintiff contends that in finding that her subjective complaints were not fully credible, the ALJ did not appropriately address her subjective complaints of pain.  Docket No. 13, p. 17-19.  Specifically, Plaintiff argues that the ALJ's determination regarding the extent of Plaintiff's fibromyalgia limitations is not supported by substantial evidence.  *Id.* at 18-19.  Plaintiff contends that because there is objective evidence that she suffers from an underlying medical condition that could reasonably be expected to produce disabling pain, the ALJ was required to evaluate Plaintiff's allegations of disabling pain by considering the factors enumerated in *Felisky v. Bowen*, yet the ALJ failed to do so.  *Id.* Plaintiff further asserts that the record indicates that she received regular treatment and medications, but they were not effective.  *Id.* at 19.

Defendant responds that the ALJ properly found that Plaintiff's fibromyalgia is not a severe impairment.  Docket No. 14, p. 8-9.  Defendant argues that "[w]hile Plaintiff alleged significant limitations, the medical records show that her pain improved with treatment;" that her "medication was effective enough that she did not need to take her fully prescribed dosages;" that she "did not begin seeing a rheumatologist until December 2008, two years after her alleged onset date;" that she then only "saw her rheumatologist annually;" and that she was "told to increase her aerobic exercise rather than decrease her activity."  *Id.* at 8-9 (citations omitted).

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's subjective allegations, including pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability . . . . [T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 852-53 (6th Cir. 1986), *quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24 (emphasis added); *see also* 20 CFR §§ 404.1529, 416.929 ("statements about your pain or other symptoms will not alone establish that you are disabled . . . ."); *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 (6th Cir. 1990) ("though Moon alleges fully disabling and debilitating symptomatology, the ALJ may distrust a claimant's allegations . . . if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other.").  Moreover, "[a]llegations of pain . . . do not constitute a disability, unless the pain is of such a debilitating degree that it prevents an individual from participating in substantial gainful employment."  *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency, and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage, and effect of medication; and the other treatment or measures to relieve pain.  *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994)*, construing* 20 CFR § 404.1529(c)(2).  After evaluating these factors in conjunction with the evidence in the record, and by making

personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981).

The ALJ in the case at bar ultimately found that:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible to further reduce her residual functional capacity. She has not presented consistent factors suggesting she would be unable to maintain activity in accord with the limitations allowed for in the identified residual functional capacity assessment. Accordingly, the undersigned finds that since the alleged onset date, the claimant has been able to perform full-time, sustained work activity within the limitations of the above residual functional capacity assessment.

TR 37.

As cited and discussed above, the ALJ fully and properly evaluated Plaintiff's fibromyalgia and its limiting effect on her ability to work. TR 32-33. The ALJ concluded that "[o]verall, there exists little objective evidence in the record to substantiate the claimant's alleged disabling fibromyalgia limitations." TR 33. As further discussed above, the ALJ's finding that the evidence of record supports only mild limitations resulting from fibromyaliga is well-supported. *Id.* The ALJ additionally explained his rationale for finding Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms to not be fully credible as follows:

In addition, it is reasonable to conclude that the claimant filed for disability due to her divorce as noted in Dr. Gotcher's March 22, 2012, [*sic*] and based on her testimony. She testified that when her husband's lawyer requested she seek disability, she had mixed feelings because she had income from being married to her physician husband and she was embarrassed to file for disability to get insurance. She testified that her husband agreed to stay married to her until she heard the outcome of her disability claim, but he then agreed to pay her health insurance as a way to finalize the divorce. She testified that his attorney requested she apply for disability. She receives $6,000 a month in alimony and got the house in the divorce. Thus, the claimant did not file for disability because of her medical condition, but rather at the request of a divorce attorney, which is damaging to her credibility. A review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments. The undersigned notes that a person's financial situation can change when going through a separation and divorce, and people will look for additional means of income and/or insurance, which appears to be the case in this matter.

TR 36.

As can be seen, the ALJ's decision specifically addresses in detail not only the medical evidence, but also Plaintiff's testimony and her subjective claims, clearly indicating that these factors were considered. *Id.* The ALJ's detailed articulated rationale demonstrates that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on evidence that was inconsistent with Plaintiff's allegations. This is within the ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; *Kirk,* 667 F.2d at 538 (6th

Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531, *citing Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531, *citing Bradley,* 862 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 921 (6th Cir. 1987). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record. S*ee King*, 742 F.2d at 975.

As discussed above, after assessing all of the medical and testimonial evidence, the ALJ ultimately determined that "[w]hile the claimant has medically determinable fibromyalgia confirmed by tender trigger points, fibromyalgia has responded favorably to medication and other conservative treatments such as physical therapy and mental health intervention with no evidence to suggest that fibromyalgia results in more than mild work-related limitations." TR 32. In making this determination, the ALJ observed Plaintiff during her hearing, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court.  Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections.  Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *See Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72.

JEFFERY S. FRENSLEY
United States Magistrate Judge